in relation to compensatory damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants Georgelas & Sons or any Successor Corporation and Francis J. Pelland jointly and severally in the full and just amount of $18,765,297.99 Dollars, plus costs.

JURY TRIAL REQUESTED:

Respectfully submitted,

By: Ernest S. Hendry, Jr. (301) 260-0822

Ernest S. Hendry, Jr., *Pro Se*

By: Judith Ventura Hendry

Judith Ventura Hendry, *Pro Se* (301) 260-0822

MOTION FOR SUMMARY JUDGMENT
(Limited to Count I - *Coram Non Judice*)

The Plaintiffs hereby adopt, by reference, the allegations set forth in Paragraphs 1-249 of the Complaint and pursuant to Rule 56 of the Federal Rules of Civil Procedure move this Court for summary judgment on Count I of the Complaint.

Summary Judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." F.R.C.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d (1986), *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "A fact is material if a dispute over it might affect the outcome of a suit under the governing law; factual

disputes that are irrelevant or unnecessary" do not affect the summary judgment determination, *Holcomb v. Powell*, 433 F.3d at 895 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. An issue is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.

Ordinarily, Defendants as opposed to Plaintiffs, seek judgment pursuant to Rule 56. This is not a typical case. There was extensive discovery in the original case in the Circuit Court of Arlington County. There was also extensive discovery in the legal malpractice case culminating in a two-week trial in the U.S. District Court for the District of Columbia. The Hendrys took an appeal from the verdict culminating in *Hendry v. Pelland*, *supra*.

Plaintiffs incorporate, in addition to the Complaint, all attachments thereto including the Prologue and Affidavit, fifty Exhibits, five complete Depositions and eight Exhibits attached hereto as A-H.

It should be emphasized that the parties in the underlying action were not on an equal footing. Elderly A. Hendry with her diminished capacity was clearly operating at a disadvantage even if she had been represented by an able and zealous advocate. The two children also had diminished capacity by reason of their tender years and lack of sophistication. E. Hendry, his sister and their respective spouses were all nonlawyers without significant experience with land transactions. On the other hand, Georgelas & Sons was an experienced developer with great experience in court cases involving land transactions. It should have been apparent to three experienced judges that Pelland's

representation was weak to the point of being suspiciously inept. Judge Sheridan certainly knew the capabilities of his long-time friend, Pelland. There were red flags in abundance.

In the foregoing Complaint, there are serious allegations about collusion between the developer through his attorney and Pelland. A statement needs to be made concerning the flawed character of attorney Katz. It is not surprising that Katz and Pelland would collaborate against the Hendrys. Katz was convicted of two felonies for income tax evasion in Anne Arundel County, Maryland. In a plea bargain Katz received a three year suspended sentence, five years probation and one hundred hours community service on each of the two counts. Katz agreed to pay all taxes owed plus interest and penalties. Katz received disciplinary punishments in several jurisdictions including the Commonwealth of Virginia. Attached hereto as EXH. F is the Order of the Virginia State Bar defining his punishment in the Commonwealth.

The attached Prologue and Affidavit are referenced; in particular, the first section of the Affidavit dealing with Pelland's betrayal of the Infants should be read carefully. An analysis of Pelland's letter to Elizabeth Vercoe on September 8, 1987 should be done here (EXH. FIFTEEN). He begins in the first paragraph with an accusation that Elizabeth was guilty of a misrepresentation. This is false inasmuch as two memos in purchaser Boniface's handwriting instructed Elizabeth to sign for her children (EXHS. THIRTEEN and FOURTEEN). In his second paragraph Pelland totally misrepresents the law to his client. He fails to mention that the contract is a "nullity" as he later stated to David Estabrook

(EXH. TWENTY). He also fails to mention that the specific performance lawsuit was "defective on its face" and lacked mutuality pursuant to *Ferebee v. Todd, supra*. He threatens her that she would be held liable if specific performance were ordered. By acknowledging that the Infants had a complete defense to the contract but stating incorrectly that Elizabeth could be held liable if the Infants failed to honor the contract, Pelland is admitting that he has an inherent conflict of interest. In this paragraph he further argues that it was better to lose on specific performance than to lose on contract damages. He failed to mention that the specific performance claim was defective on its face (*Ferebee, supra*). It is difficult to comprehend the Hendrys losing on contract damages with a contract that was void because it never had been ratified; if Pelland had researched the law, he would have found the Virginia case, *Duggin v. Williams*, 233 Va. 25 (1987), 353 S.E.2d 721, which also involved an assignment of a contract and a denial of the condition precedent by the zoning authority. The Virginia Supreme Court ruled in *Duggin* that there could be no lost profits because the assignment and the new application after the condition precedent failed could not have been contemplated at the time the original parties formulated the contract. In paragraph four Pelland gave advice that amounted to "a wild goose chase." Elizabeth followed this absurd advice of hiring Massachusetts attorneys to have her appointed guardian for her children. As mentioned in the Complaint, Pelland actually helped Katz with his deposition of Elizabeth by informing him of these activities of Massachusetts counsel. Katz even asked Elizabeth if she had been appointed guardian *ad litem*. Elizabeth

correctly responded that she had been appointed guardian for her children. All of this was a smokescreen to make the Hendrys think that "the defect" had been "cured." Note that Pelland cleverly used the word "defect" instead of "defense." At the end of paragraph four, Pelland advises his client to "cure the defect before it becomes a matter of record." In reality the so-called defect was already a matter of record. The last thing that Pelland wanted to do was to inform the Hendrys that the contract was void *ab initio* and *in toto* and that a specific performance lawsuit against Infants was "defective on its face" and "lacking mutuality." From reading this letter, Pelland indicates that he just learned about the status of the Infants. He would prefer that others believe that he was so incompetent and negligent that he was ignorant of the status of the children for fourteen months so that he could provide some cover for the court's supposed ignorance. To believe that this honor graduate of Georgetown University Law Center did not know the legal status of the two children stretches credulity to the utmost. In summary, this letter to Elizabeth and the letter to Estabrook (EXH. TWENTY) show the dishonesty and the treachery of Pelland as clearly as any two documents. Crooks like Pelland often make a mistake when some unforeseen event occurs that does not follow the script. Such an event occurred when a zealous attorney named Estabrook began perusing the court files in the case and threatened litigation if the Hendrys didn't pay a commission to his realtor client's estate. Pelland was scared that the entire fraudulent scheme would unravel in the ensuing discovery of a second case. Pelland had no guarantee that he would be rehired to defend the Hendrys. Thus, Pelland, in a

panic, used the lethal defense of the lack of execution by the Infants as a defense against Estabrook's client. Such a defense was never used against Georgelas -- Pelland's true client. It would be a grave mistake to give a benefit of a doubt to felon Katz, Pelland and the three judges in the case. They all knew the facts concerning the Infants. The problem was (1) that there was too much money involved with the property to dismiss the case in favor of the Hendrys; (2) the Hendrys were perceived as patsies and vulnerable; and (3) the five officers of the court all lacked integrity. They should all be held to the same high standard of being competent, ethical experts on the law in Virginia.

In his letter to Elizabeth (EXH. FIFTEEN), Pelland wanted to know who advised Elizabeth that she could sign the contract for her children. E. Hendry visited his sister, and she asked him who advised Boniface that she could sign for her children. E. Hendry was told by Boniface that it was his lawyer, James Falk. We will never know the whole truth. Boniface refused to waive privilege for Falk to testify in the case. Georgelas was thirsting for the land for at least a decade. Boniface did not want to go through an arduous guardian *ad litem* procedure which could result in an unsatisfactory result with respect to the contract. Boniface may have disrergarded Falk's advice, or Falk may have given incorrect advice. It was in Boniface's interest to get Elizabeth to sign for the children, whether it was proper or not, because Boniface knew that he could assign the contract to Georgelas immediately whether it was a good contract or not and whether the children's rights were protected or ignored.

Former Dean of the Law School at Hofstra University, Monroe Freedman,

was the Hendrys' expert on Pelland's fiduciary violations in *Hendry v. Pelland*. He made the disclaimer in his deposition that he was not a Virginia lawyer, and he did not purport to be an expert on guardianships. Nonetheless, in his trial testimony he did bring out the fact that Pelland's representation of the Infants was an excellent example of how conflicts of interest can damage some clients at the expense of others. Attached hereto as EXH. G is an excerpt from Appellants' Brief in *Hendry v. Pelland*. By naming Pelland as the children's guardian *ad litem,* Kendrick not only named him too late for the contract, but he did the children irreparable harm since the choice was not an independent one. Clearly the court lost any claim to jurisdiction over the case at this point.

As referenced in Paragraph 107 of the Complaint, a joint motion was filed by Katz and Pelland to reopen the case for the purpose of encumbering the Infant lands. (See EXH. EIGHTEEN.) In paragraph 3 of the joint motion, Katz and Pelland state: "During the time between Pelland's application for appointment as Guardian Ad Litem and the date that he was so appointed he learned that the necessary guardian ad litem authority had not been obtained in connection with execution of the January 23, 1985 Option Agreement." This lie was told to give the court cover when Judge Kendrick appointed the greatly conflicted Pelland to serve as guardian *ad litem* for the children. The contract had to be ratified under the auspices of an independent guardian *ad litem*, not a hopelessly conflicted one. It had to be ratified as to whether it was even in the interest of the children to sell their property, and, if so, at what price and under what terms. The little lie was told here to mask a much bigger lie that involved

the two attorneys as well as the three judges who had a significant role in the case. These five officers had a combined experience either on the bench or as lawyers of more than 100 years. In addition, they each had three years of legal training in some of the finest law schools in the country. But these five highly qualified individuals had to **pretend** that they had bumbled, fumbled and stumbled around because they did not understand the status of two children with undivided interests in the property. It was as though these five highly sophisticated individuals were playing a game of charades.

Judge Sheridan had a special obligation to the Infants as wards of the court. If he could not fulfill that obligation properly because the joint motion was presented by his long-time friend from law school who worked with him on the law review (Pelland), he should have recused himself. When he definitely learned the true status of the Infants with the application to encumber the property, he should have informed himself adequately concerning Infant rights when Infants have an undivided interest in land. Arthur Gajarsa, who was not even a Virginia lawyer, wrote Boniface as referenced in Paragraph 18 of the Complaint: "These minor children would need a review by a court appointed guardian ad litem in order to properly convey title to any prospective purchaser." If Gajarsa knew this, why wouldn't the judge know it?

The judge had a special obligation to search the files in the same building where he held court to determine whether there was a case that was styled "*In Re Andrea Pryce Vercoe and Galen Scott Vercoe*." The identity of a prior guardian *ad litem* would have been of critical interest as well as the identity of the

judge who handled it. Why wouldn't Judge Sheridan have consulted *Michie's Jurisprudence* to learn the following point of law: "The title to the interest in lands of Infants cannot be divested and transferred in a suit for specific performance."? Why wouldn't the judge have researched cases on point and found *Ferebee v. Todd*, 154 Va.293, 153 S.E. 705 (1930)? *Ferebee* has never been overruled or modified by the Virginia Supreme Court. A specific performance lawsuit against Infants is defective on its face. Thus, the lawsuit itself was a nullity.

In *Payne v. Consolidation Coal Company,* 538 F. Supp. 950, it was held: "Since the statute creates the special jurisdiction of the state court in these matters, a lack of **substantial compliance** makes a proceeding under these statutes void *ab initio* and *in toto* because there is a want of jurisdiction." [Emphasis added.] The term "substantial compliance" appears in numerous cases in Virginia and elsewhere with respect to cases involving Infants' statutes.

*Coleman v. Virginia Stave Company,* 112 Va. 61 (1911) involved the sale of timber on land owned by an Infant. The Virginia Supreme Court held: "[T]hey (the children) stand as **hostile parties** objecting to every step." "[I]t does not authorize a mode of procedure not in **substantial compliance** with the statute authorizing the sale." "A failure to aver what property the infant owned besides that sought to be sold and to adduce any proof of the propriety of the sale, is not **substantial compliance."** "Not only was there no averment in the bill as to the property then belonging to the infants, but there was no evidence introduced on that subject." "Where a court is given jurisdiction by statute, and the mode of

acquiring and exercising it is prescribed by statutes, a **substantial compliance** is necessary to give the proceedings validity." [Emphasis added.] In *Georgelas, supra,* Pelland never behaved on behalf of the Infants in a hostile way objecting to anything. The motion to encumber the children's lands, thereby subjecting them to foreclosure, was a joint one of Katz and Pelland. Using the position taken by the court in *Coleman* as a criterion for assessing what occurred in *Georgelas,* there was not even a meagre attempt at substantial compliance with the statutes re Infants.

In *Clark v. George,* 161 Va. 104 (1933), the court ruled: "Contract for sale of Infants' lands held not specifically enforceable against purchaser because of lack of mutuality." The court further ruled: "To warrant confirmation of sale of Infants' lands there must be a **substantial compliance** with chapter of code authorizing sale." [Emphasis added.] The *Clark* court cited both *Tulin v. Johnston,* 152 Va. 587 (1929) and *Ferebee, supra.*

In *Brenham v. Smith,* 120 Va. 30 (1916), the court leaned heavily on the *Coleman* court's opinion. The *Brenham* court added: "In this state a court of equity has no authority under its general jurisdiction as guardian of infants to sell their real estate whenever it is to the advantage of the infants to do so whether for reinvestment or for their maintenance and education." "It seems to be settled law that where a new jurisdiction is created by statute and the mode of acquiring that jurisdiction by the court upon which it is conferred is prescribed by statute, a **substantial compliance** therewith at least, is essential; otherwise the proceeding will be a nullity." [Emphasis added.]

In *Anthony v. Kasey*, 83 Va. 338 (1987), the court held: "Though the court may possess jurisdiction of a cause, of the subject matter, and of the parties, it is still limited in its modes of procedure and in the extent and character of its judgments. A departure from established modes of procedure will often render the judgment void." In *Georgelas* there was not only a complete lack of adherence to modes of procedure, but the entire procedure involving the Infants' rights was sullied by acts of deception, false pretenses, lies and misrepresentations.

Virginia is not atypical in requiring court review of a transaction involving lands owned by Infants. *See Frantz v. Lester,* 82 W.Va. 328, 95 S.E. 945. It was stated in this case: "To effect a regular and unimpeachable sale, the requirements of the statute must be **strictly complied with,** and the courts cannot rightfully dispense with notice to the infants." [Emphasis added.] The West Virginia Supreme Court held that Millia Lester was properly appointed guardian *ad litem* for her children, but confusion ensued when the judge who appointed her suddenly died, and the clerk of the court forgot to record the appointment in the court's records. This unforeseen SNAFU did not invalidate the appointment because the statutes were complied with essentially. *Frantz* is to be sharply distinguished from *Georgelas* because the degree of compliance with the statutes is so dissimilar. *See Flannery v. Chiles*, 222 Ky. 649 (1928). *Quoting Flannery*, "The appellant Flannery, having assumed no obligation under the contract, has no right of action against Chiles, and the infants through their guardians, have no right of action since the contract, in attempting to sell their


interests **for a fixed sum**, was illegal." [Emphasis added.] *See also Bracy v. Miller*, 169 Ark. 1115, 278 S.W. 41, 43 A.L.R. 114 (1925). In *Bracy quoting Fry* on specific performance, section 460, it is said that - "A contract to be specifically performed by the court must, as a general rule, be mutual; that is to say that at the time it was entered into, have been enforced by either of the parties against the other of them."

If Judge Sheridan had done the necessary legal research and informed himself adequately, he would have also learned that his jurisdiction to rule in this case was not derived from his general equity powers as a judge, but from the strict adherence to the statutes re Infants and the interpretations of said statutes as in *Ferebee* by the Virginia Supreme Court.

Needless to say, Judge Kendrick and Judge Monroe also failed to research the law and inform themselves adequately re Infant owners of land. Kendrick's outrageous conduct in the second case when the Hendrys challenged the settlement raises further suspicions concerning the court's actions. The late Judge Monroe does not escape condemnation because his pronouncements concerning "enrichment" were completely inconsistent with his basic knowledge of hornbook law as evidenced by his opinion in *National Orthopaedic Hospital v. County Board of Arlington, supra.* (EXH. THIRTY-FIVE)

It was indeed outrageous that Judge Kendrick filed two final orders in Chancery No. 89-969. When the statutes ran on the Hendrys' ability to file additional motions and note an appeal to the Virginia Supreme Court because Joseph Hyman was not notified about the first final order, either by the court or

by opposing counsel, they lost their rights to an appeal on the merits. By effectively forcing a settlement on the Hendrys through intentional misrepresentation of the law in the settlement conference by Judge Monroe and by the intentional misconduct by Pelland in not correcting the Judge's concept of "enrichment," both the court and the two attorneys concealed the fraud and prevented the Hendrys from having an unbiased review by a higher court. In Chancery No. 89-969, both the court (Judge Kendrick) and the developer through attorney Katz concealed the fraud by abusing procedures including notice to the Hendrys in preventing an appeal. Thus the imprimatur of legitimacy was stamped on the results of Chancery No. 87-671 (the underlying case) and Chancery No. 89-969 (the failed challenge to the underlying case). This explains why it has taken so long for the Hendrys to discover and expose the fraud. The concealment in both cases and the total complicity by the court negate any attempts by the defendants in this case to raise laches or statute of limitations defenses to the current action. In *Plant v. Humphries,* 66 W.Va. 88, 66 S.E. 94 (1909), the court held: "When the statute of limitations is applicable to a cause of action arising out of fraud, it runs from the perpetuation of the fraud, unless there has been fraudulent concealment of the cause of action." This particular case and motion survive in any event because the court lacked jurisdiction in the original case for failure to **adhere to the standard of substantial compliance** with respect to the statutes re infants. *See* Virginia Code, Section 8.01, 68-72 *et seq.*

There are no facts in dispute. The court knew the facts. Katz and

Pelland, as shown by their agreed motion, (EXH. EIGHTEEN) knew the facts. Since Katz was the attorney for Boniface and Georgelas, certainly Georgelas had constructive knowledge if not actual knowledge of the facts.

Mutuality is an essential element of any contract. Since Katz was the attorney for both Boniface and Georgelas, it is necessary to charge Georgelas with any knowledge that Boniface had concerning the lack of execution of the contract through a court-appointed guardian *ad litem*. (See EXHS. TWELVE, THIRTEEN, FOURTEEN and TWENTY.) The owners had no privity with the assignment of the contract from Boniface to Georgelas. The owners had no contemplation of this assignment although Boniface was within his rights to make the assignment. The owners made no guarantees to Georgelas. Since Boniface clearly knew that the children had not executed the contract through a court-appointed guardian *ad litem*, Georgelas had constructive knowledge of this fact. Georgelas took the contract "AS IS" just as a buyer of a used car takes ownership of the vehicle "AS IS." Let us suppose that shortly after the assignment took place, the real estate market hit the skids in the midst of a terrible recession. Let us suppose that the Hendrys did not care about how the property was used; all that the Hendrys wanted was the $4.5 million purchase price named in the contract (for a retirement home). Under these hypothetical circumstances Georgelas would <u>not</u> have wanted the property at any price. Suppose that the Hendrys retained an honest lawyer to threaten to file a specific performance lawsuit against Georgelas. In such a situation, the Georgelas attorney would have replied reminding Hendry counsel of the lack of execution of

the contract by the Infants through a court-appointed guardian *ad litem*. The Georgelas attorney could even cite *Ferebee, supra*, stating that the contract must have mutuality. Where both parties are not bound, specific performance will always be denied. Only a completely dishonest attorney such as Pelland would have taken the Hendrys' greatest defense and turned it into a weapon to terrorize Elizabeth Vercoe and allow an illegal lawsuit to proceed. (See EXH. FIFTEEN.)

The Option Agreement (EXH. SIX) was a nullity, void *ab initio* and *in toto*. Similarly, the specific performance suit (since it was based on the Option Agreement) was a nullity, void *ab initio* and *in toto*. Certainly any settlement contract based on a lawsuit that was defective on its face (*Ferebee, supra*) would be a nullity, void *ab initio* and *in toto*.

Pursuant to the doctrine *coram non judice* and the equitable doctrine of restoring victims of a debacle to the position they would have had if the event had not occurred, Plaintiffs are entitled to the amount they paid ($2,085,033.11) pursuant to the bogus settlement plus interest plus costs from Georgelas & Sons, Inc. or any Successor Corporation.

A schedule of payments made by the Hendrys in accordance with the bogus settlement follows. (See EXHS. ONE, TWO, THREE and FOUR.)

**To Georgelas**

| | | |
|---|---|---|
| $150,000.00 | 6/30/1988 | EXH. TWO |
| 150,000.00 | 6/01/1990 | EXH. THREE |
| 111,000.00 | 6/01/1990 | EXH. FOUR |

**To Continental Federal Savings & Loan**

| | | |
|---|---|---|
| 111,000.00 | 6/01/1991 | EXH. FOUR |
| 111,000.00 | 6/01/1992 | EXH. FOUR |
| 111,000.00 | 6/01/1993 | EXH. FOUR |
| 111,000.00 | 6/01/1994 | EXH. FOUR |

**To Continental Federal Savings & Loan on Date of Sale to Arlington County**

| | | |
|---|---|---|
| 1,200,000.00 | 9/09/1994 | Principle Due E.S.H., Jr. |
| 30,015.11 | 9/09/1994 | Accrued Interest |
| 18.00 | 9/09/1994 | Fees |
| $2,085,033.11 (TOTAL) | | |

Proof of the amount that the Hendrys paid to the bank when they sold their property to Arlington County is attached hereto as EXH. H.

By: Ernest S. Hendry Jr.
Ernest S. Hendry, Jr., *Pro Se*

By: Judith Ventura Hendry
Judith Ventura Hendry, *Pro Se*